01-1535-cr(L) (4thA)
In re Terrorist Bombings of U.S. Embassies (Fourth Amendment Challenges)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: December 10, 2007                    Decided: November 24, 2008)

Docket Nos. 01-1535-cr (L), 01-1550-cr (con), 01-1553-cr (con),
01-1571-cr (con), 05-6149-cr (con), 05-6704-cr (con)

In re TERRORIST BOMBINGS OF U.S. EMBASSIES IN EAST AFRICA (FOURTH AMENDMENT CHALLENGES),

UNITED STATES OF AMERICA,

*Appellee*,

v.

MOHAMED SADEEK ODEH, also known as Abu Moath, also known as Noureldine, also known as Marwan, also known as Hydar, MOHAMED RASHED DAOUD AL-'OWHALI, also known as Khalid Salim Saleh Bin Rashed, also known as Moath, also known as Abdul Jabbar-Ali Abel-Latif, WADIH EL HAGE also known as Abdus Sabbur,

*Defendants-Appellants*,

KHALFAN KHAMIS MOHAMED, also known as Khalfan Khamis,

*Defendant.*

Before: FEINBERG, NEWMAN, and CABRANES, *Circuit Judges*.

Defendants appeal from judgments of conviction entered by the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) following a jury trial in which they were found guilty of offenses arising from their involvement in an international conspiracy—led by Osama Bin Laden and organized through the al Qaeda terrorist network—to kill American citizens and destroy American facilities across the globe. Defendant-appellant El-Hage, a citizen of the United States, contends, *inter alia*, that evidence obtained overseas without a warrant should have been suppressed

1

from his trial.  We see no merit in this challenge, affirm El-Hage's conviction, and remand his case only for the purpose of re-sentencing for the reasons stated in this opinion and in *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008) filed today.

> DAVID RASKIN and LESLIE C. BROWN, Assistant United States Attorneys (Michael J. Garcia, United States Attorney, *on the brief,* Iris Lan, David O'Neil, Katherine Polk Failla, Celeste L. Koeleveld, Assistant United States Attorneys, *of counsel*), United States Attorney's Office for the Southern District of New York, New York, NY, *for Appellee United States of America.*
>
> JAMES E. NEUMAN, New York, NY, *for Defendant-Appellant Mohamed Sadeek Odeh.*
>
> FREDERICK H. COHN, New York, NY, *for Defendant-Appellant Mohamed Rashed Daoud Al-'Owhali.*
>
> JOSHUA L. DRATEL and SAM A. SCHMIDT (Erik B. Levin, Renita K. Thukral, Meredith S. Heller, *of counsel*), New York, NY, *for Defendant-Appellant Wadih El Hage.*

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant-appellant Wadih El-Hage, a citizen of the United States, challenges his conviction in the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) on numerous charges arising from his involvement in the August 7, 1998 bombings of the American Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania (the "August 7 bombings").[1]  In this opinion we consider El-Hage's challenge to the District Court's denial of his motion to suppress evidence obtained by the government from an August 1997 search of his residence in Nairobi, Kenya and electronic surveillance of telephone lines—land-based and cellular—conducted in Kenya between August 1996 and August 1997.  Other challenges and those of El-Hage's co-defendants, Mohamed

---

[1] For a detailed description of the factual background and procedural history of this case, see *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008).

Sadeek Odeh and Mohamed Rashed Daoud Al-'Owhali, are considered in two separate opinions filed today, *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

El-Hage contends that the District Court erred by (1) recognizing a foreign intelligence exception to the Fourth Amendment's warrant requirement, (2) concluding that the search of El-Hage's home and surveillance of his telephone lines qualified for inclusion in that exception, and (3) resolving El-Hage's motion on the basis of an *ex parte* review of classified materials, without affording El-Hage's counsel access to those materials or holding a suppression hearing. Because we hold that the Fourth Amendment's requirement of reasonableness—and not the Warrant Clause—governs extraterritorial searches of U.S. citizens and that the searches challenged on this appeal were reasonable, we find no error in the District Court's denial of El-Hage's suppression motion. In addition, the District Court's *ex parte*, *in camera* evaluation of evidence submitted by the government in opposition to El-Hage's suppression motion was appropriate in light of national security considerations that argued in favor of maintaining the confidentiality of that evidence. El-Hage's challenge to his conviction is therefore without merit.

## I.   BACKGROUND

### A.   Factual Overview

American intelligence became aware of al Qaeda's presence in Kenya by mid-1996 and identified five telephone numbers used by suspected al Qaeda associates. *United States v. Bin Laden*, 126 F. Supp. 2d 264, 269 (S.D.N.Y. 2000). From August 1996 through August 1997, American intelligence officials monitored these telephone lines, including two El-Hage used: a phone line in the building where El-Hage lived and his cell phone. *See id.* The Attorney General of the United States then authorized intelligence operatives to target El-Hage in particular. *Id.* This authorization, first issued on

3

April 4, 1997, was renewed in July 1997. *Id.* Working with Kenyan authorities, U.S. officials searched El-Hage's home in Nairobi on August 21, 1997, pursuant to a document shown to El-Hage's wife that was "identified as a Kenyan warrant authorizing a search for 'stolen property.'" *Id.* At the completion of the search, one of the Kenyan officers gave El-Hage's wife an inventory listing the items seized during the search. *Id.* El-Hage was not present during the search of his home. *Id.* It is uncontested that the agents did not apply for or obtain a warrant from a U.S. court.

**B.     El-Hage's Pretrial Motion to Suppress Evidence Obtained from His Residence and Telephones in Kenya**

El-Hage filed a pretrial motion pursuant to the Fourth Amendment[2] for the suppression of (1) evidence seized during an August 1997 search of his home in Nairobi and the fruits thereof; (2) evidence obtained through electronic surveillance of four telephone lines, including the telephone for his Nairobi residence and his Kenyan cellular phone, conducted between August 1996 and August 1997; and (3) tape recordings or summaries of telephone conversations resulting from electronic surveillance of El-Hage's home in Arlington, Texas, conducted in August and September 1998 pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), Pub. L. No. 95-511, 92 Stat. 1783 (codified as amended at 50 U.S.C. §§ 1801 *et seq.*). El-Hage urged the suppression of the evidence resulting from the search of his Nairobi home and surveillance of his Kenyan telephone lines (collectively, the "Kenyan searches") on the grounds that neither search was authorized by a valid warrant and, in the alternative, that the searches were unreasonable. With respect to the electronic surveillance of his home in Texas, El-Hage maintained that the government failed to comply with certain safeguards set forth in FISA. To establish a factual record for the resolution of his motion, El-

---

[2] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Hage requested a hearing before the District Court.

The government opposed El-Hage's motion on the ground that the Fourth Amendment's warrant requirement is inapplicable to overseas searches conducted for the purpose of gathering foreign intelligence. It also asserted that the need for an evidentiary hearing probing the basis for the Kenyan searches was outweighed by the need to maintain the confidentiality of the underlying intelligence. With respect to evidence obtained pursuant to the FISA-authorized surveillance of El-Hage's Texas home, however, the government "assured the [District] Court that it d[id] not intend to offer any of this evidence in its case-in-chief and . . . also indicated that there [we]re no fruits from the FISA tree with respect to [E]l[-] Hage." *United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 30061, at *5 (S.D.N.Y. Jan. 2, 2001) (quoting Letter from Assistant United States Attorney Kenneth M. Karas to the District Court dated Oct. 23, 2000) (internal quotation marks omitted). Based on the government's representations, El-Hage withdrew his suppression motion insofar as it related to the surveillance of his Texas home.[3] *See Bin Laden*, 2001 WL 30061, at *5.

## C.     The District Court's Decision

The District Court denied El-Hage's request for a suppression hearing in open court, choosing instead to resolve the motion based on an *in camera*, *ex parte* review of the government's submissions, which included classified materials relating to the Kenyan searches. In an Opinion dated December 5, 2000, the District Court explained that its decision to forgo an adversarial hearing was based on (1) the need to maintain the confidentiality of the relevant classified materials and (2) the limited scope of the factual inquiry necessary to resolve the motion. *Bin Laden*, 126 F. Supp. 2d at 287. First, the District Court was persuaded by the government's representations that al Qaeda posed an "ongoing threat" to the United States and that disclosure of the sensitive material underlying the Kenyan searches would

---

[3] Accordingly, the propriety of the Texas surveillance is not before us on this appeal.

5

have a "potentially damaging impact . . . on existing foreign intelligence operations." *Id.* Second, the District Court construed the issues presented by El-Hage's motion as "predominantly legal," requiring only a "limited factual inquiry." *Id.* Because El-Hage's motion did not turn on the resolution of factual disputes, the District Court concluded that "the benefit of holding an adversary hearing was substantially lessened." *Id.* Taking these two factors into account, the District Court concluded that an *in camera*, *ex parte* review of the relevant evidence—and not an adversarial hearing in open court—was warranted.

Turning to the merits of El-Hage's motion, the District Court recognized the novelty of the issue before it—that is, "whether an American citizen acting abroad on behalf of a foreign power may invoke the Fourth Amendment, and especially its warrant provision, to suppress evidence obtained by the United States in connection with intelligence gathering operations." *Id.* at 270. Relying principally on Justice Black's plurality opinion in *Reid v. Covert*, 354 U.S. 1, 7 (1957) (concluding that Fifth and Sixth Amendment protections extend to U.S. citizens on foreign territory), the District Court determined that the protections articulated in the Fourth Amendment apply in some form to U.S. citizens, such as El-Hage, when they are abroad. *See Bin Laden*, 126 F. Supp. 2d at 270-71. The District Court qualified its determination, however, explaining that the "extent" of the Fourth Amendment's protections and, in particular, the "applicability" of the Fourth Amendment's Warrant Clause remained "unclear." *Id.* at 271.

Without determining whether warrants are generally required for overseas searches involving U.S. citizens, the District Court concluded that even if the warrant requirement applied, the bulk of the Kenyan searches would not be subject to it, based on the Court's determination that an exception for searches conducted to gather foreign intelligence existed. *Id.* at 277-82. The District Court acknowledged that the Supreme Court has left unresolved the issue of the applicability of the warrant

6

requirement and the existence of a foreign intelligence exception. *Id.* at 271 (citing *United States v. United States District Court (Keith),* 407 U.S. 297, 321-22 (1972) (holding that no warrant exception existed for "domestic security" surveillance but explicitly stating that the Court had "not addressed, and express[ed] no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents")). Noting pre-FISA precedents from the Third, Fourth, Fifth, and Ninth Circuits, the District Court observed that courts had "affirmed the existence of a foreign intelligence exception to the warrant requirement for searches conducted within the United States which target foreign powers or their agents." *Id.* The District Court could find no authority, either within or beyond our Circuit, for the proposition that this exception applied overseas. *Id.* at 272. Faced with this dearth of authority, the District Court identified three factors set forth in the pre-FISA precedents that gave rise to the recognition of a foreign intelligence exception in those cases: (1) the President's power to conduct foreign relations, (2) the costs of imposing a warrant requirement, and (3) the absence of warrant procedures. *Id.* at 272-77. It then applied these factors to the context of gathering foreign intelligence overseas to determine whether an exception should be recognized in that context.

Evaluating the first factor—the President's authority over international relations—the District Court noted the long line of cases recognizing the "constitutional competence of the President in the field of foreign affairs" generally and the "power over foreign intelligence collection" specifically. *Id.* at 272. While noting that this authority does not exempt the President from compliance with other provisions of the Constitution, the District Court observed that foreign intelligence gathering unauthorized by warrants had been an "established practice of the Executive Branch for decades," *id.* at 273, and that Congress had not attempted to impose restrictions on that practice when implemented overseas, despite having adopted restrictions in FISA on foreign intelligence gathering conducted domestically, *id.* The District Court also noted that the Supreme Court had not expressed disapproval

7

of the practice. *Id.* In light of the Constitution's grant of authority over foreign affairs to the President, the President's longstanding assertion of that authority, and the apparent acquiescence of Congress and the Supreme Court to that authority, the District Court determined that this factor weighed in favor of recognizing an exception to the warrant requirement.

Turning next to the costs arising from imposing a warrant requirement, the District Court identified authority set forth by the Supreme Court and by our Circuit, recognizing that "when the imposition of a warrant requirement proves to be a disproportionate and perhaps even disabling burden on the Executive, a warrant should not be required." *Id.* Imposing a warrant requirement on foreign intelligence searches conducted abroad would, in the District Court's view, impose such a burden on the President because obtaining a warrant would (1) delay executive action, (2) jeopardize the confidentiality of sensitive information, and (3) possibly disrupt cooperative relationships with foreign powers fearful of inadvertent disclosures in the course of U.S. court proceedings. *Id.* at 274-75. This factor, therefore, also supported recognition of an exception for the overseas searches at issue.

Finally, the District Court observed that procedures for obtaining warrants to conduct overseas searches did not exist, noting "there is presently no statutory basis for the issuance of a warrant to conduct searches abroad." *Id.* at 275. According to the Court, the government could not be expected to rely on existing warrant procedures geared toward domestic searches, which were ill-suited to the needs of foreign intelligence gathering conducted overseas for two reasons: (1) U.S. courts lack jurisdiction to issue such warrants and (2) the probable cause and notice requirements, integral to U.S. warrant procedures, would undermine the timeliness and effectiveness of covert intelligence gathering abroad. *Id.* at 276 & n.14. This factor, combined with the previous two, persuaded the District Court that an exception to the Fourth Amendment's warrant requirement existed for "searches targeting foreign powers (or their agents) which are conducted abroad." *Id.* at 277.

The District Court then defined the scope of the foreign intelligence exception "to include only those overseas searches, [1] authorized by the President (or his delegate, the Attorney General), which are [2] conducted primarily for foreign intelligence purposes and which [3] target foreign powers or their agents." *Id.* With respect to the latter two criteria, the District Court found, based on its *in camera*, *ex parte* review of the classified evidence, that the primary purpose of the Kenyan searches was to obtain foreign intelligence pertaining to the activities of Osama Bin Laden and al Qaeda, *id.* at 278-79, and the government had probable cause to believe that El-Hage was an agent of a foreign power, specifically al Qaeda, *id.* at 277-78. Only a portion of the surveillance, however, satisfied the first criterion. The District Court noted that even though the Kenyan telephone lines were monitored from August 1996 through August 1997, the Attorney General had not given her express authorization to conduct this surveillance until April 1997, eight months after it was already underway. *Id.* at 279. Accordingly, the District Court ruled that the telephone surveillance conducted between April and August 1997 and the search of El-Hage's Nairobi residence in August 1997 qualified for the foreign intelligence exception to the warrant requirement, but the pre-April 1997 surveillance did not. *Id.*

The District Court nevertheless declined to suppress the fruits of the pre-April 1997 surveillance on the grounds that (1) doing so would not deter official misconduct and (2) the government acted in good faith. *Id.* at 282. Relying on precedents of the Supreme Court and this Court, the District Court reasoned that the "main purpose of the exclusionary rule is deterrence," *id.* at 282, and suppression is not warranted when "it would achieve little or no deterrence," *id.* at 283 (quoting *United States v. Ajlouny*, 629 F.2d 830, 840 (2d Cir. 1980)). In light of the government's strong interest in gathering intelligence on the activities of al Qaeda, the District Court concluded that the pre-April 1997 surveillance was primarily for the purposes of foreign intelligence rather than criminal investigation and, consequently, would have occurred even if the government knew that any evidence

9

thereby obtained would be excluded from any future criminal trial. *Id.* at 283. Because the deterrence would be limited, the District Court invoked the "good faith" exception to the exclusionary rule, as set forth by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), and *Illinois v. Krull*, 480 U.S. 340 (1987), as another ground for denying suppression. 126 F. Supp. 2d at 283. The District Court found reasonable, if ultimately inaccurate, the government's belief that it did not need authorization to conduct surveillance on the Kenyan telephones in the absence of controlling precedent to the contrary and in light of the primary purpose of the surveillance, which was to obtain foreign intelligence. *Id.* at 284. Accordingly, the District Court was "persuaded that the officials who conducted the electronic surveillance operated under an actual and reasonable belief that Attorney General approval was not required prior to April 4, 1997," *id.*, and, on that basis, the District Court declined to suppress the surveillance conducted between April and August 1997 as fruits of the pre-April 1997 surveillance.

The District Court then considered whether the Kenyan searches satisfied the Fourth Amendment's core requirement of reasonableness. The District Court explained that even if the Warrant Clause was inapplicable, the Kenyan searches were nevertheless subject to the Fourth Amendment's requirement that searches be reasonable. *Id.* Turning first to the search of El-Hage's Nairobi home, the District Court rejected El-Hage's argument that because the search invaded the "sanctity of the home" it was *per se* unreasonable, *id.* at 284-85, concluding, on the basis of the "limited scope and overall nature of the search," that the residential search was "executed in a reasonable manner," *id.* at 285. The District Court then evaluated the telephone surveillance, which it found was of a constant duration for the period in question. *Id.* at 285-86. While the "excessive length" and ineffective "minimization"[4] of government surveillance are factors that often weigh in favor of finding

---

[4] The government's obligation to "minimize" interceptions of non-pertinent communications is established by statute. *See* 18 U.S.C. § 2518(5) ("Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter.").

a search unreasonable, the District Court did not find the duration of the telephone surveillance here unreasonable, in light of the relevant context. *Id.* at 286. Specifically, the District Court was persuaded by the government's representations that extensive monitoring was necessary because of (1) the "world-wide, covert and diffuse nature" of the terrorist group targeted; (2) the use of foreign languages in the monitored conversations; (3) the likelihood that the conversations were conducted in seemingly innocuous code; (4) the minimization efforts made—in particular, the government's decision to transcribe only relevant conversations and its restrictions on the dissemination of El-Hage's name; and (5) the communal nature of the telephone lines in question among various al Qaeda operatives. *Id.* Accordingly, the evidence resulting from the Kenyan searches was not suppressed, the case proceeded to trial by jury, and El-Hage was convicted, as described more fully in *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008).

**D. Post-Conviction Rulings**

In a post-conviction motion, El-Hage challenged the District Court's decision not to suppress the evidence resulting from the Kenyan searches. He contended that (1) the finding of good faith was erroneous, (2) the foreign intelligence exception did not apply because the government's motive for the Kenyan searches was primarily for the purposes of a criminal investigation, and (3) a warrant should have been obtained for the search of his computer, which had been seized from his Nairobi home. *See United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604, at *2-6 (S.D.N.Y. Oct. 2, 2001). Adhering to its pretrial ruling, the District Court rejected El-Hage's contentions and denied the motion. *Id.*

Over two years later, El-Hage filed another post-conviction motion, contending that "new evidence" supported his request to suppress the evidence from Kenya. In this motion, El-Hage relied on the then-recently issued July 24, 2003 Report of the United States Senate Select Committee on

Intelligence and the United States House of Representatives Permanent Select Committee on Intelligence on the Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, which documented certain errors made in various FISA applications filed around the same time as the FISA-authorized surveillance of El-Hage's Texas home. *See United States v. Bin Laden*, No. 98 Cr. 1023, 2005 WL 287404, at \*10 (S.D.N.Y. Feb. 7, 2005). Again urging the District Court to revisit its suppression ruling, El-Hage maintained that this "new evidence" (1) suggested that the primary purpose of the Kenyan searches was investigatory and (2) undermined the finding that the government acted in good faith during the period of surveillance unauthorized by the Attorney General. *See id.* Judge Kevin Thomas Duffy, to whom the case had been assigned for post-judgment proceedings, denied the motion, observing that "the [suppression] motion El-Hage seeks to reopen does not involve evidence gathered pursuant to a FISA warrant" and "any mistakes in FISA applications are at best tangential and at worst totally irrelevant" to the Kenyan searches. *Id.* The District Court concluded that the new evidence did not warrant reconsideration of the suppression ruling. *Id.*

## II.    DISCUSSION

### A.    *In Cam e ra*, *Ex Parte* **Review of Evidence**

As a preliminary matter, we address El-Hage's objection to the District Court's resolution of his suppression motion on the basis of an *in camera*, *ex parte* review of evidence submitted by the government. El-Hage argues strenuously that without an evidentiary hearing the District Court could not properly evaluate the merits of his motion. Specifically, El-Hage contends that had he been permitted access to those materials and given an opportunity to be heard with regard to them, he would have argued that (1) the majority of the intercepted communications were unrelated to national security, (2) the government failed to limit (or "minimize") its surveillance of irrelevant

12

communications, (3) the search of his Kenyan home was pursuant to a criminal investigation and not part of an effort to gather foreign intelligence, and (4) the surveillance was not conducted in "good faith on any level." El-Hage Br. 165-73, 185-86. The District Court's failure to hold a hearing, El-Hage urges, cast aside the integral role of the adversarial process in determining the primary purpose of the surveillance and whether the government acted in good faith. We disagree. In light of the limited factual inquiry into evidence of consequence to national security that was necessary to resolve El-Hage's motion and because the legal issues were "thoroughly briefed by the parties," *Bin Laden*, 126 F. Supp. 2d at 287, we see no error—much less an abuse of discretion—in the District Court's decision to review *in camera* the government's *ex parte* submissions.

The denial of a defendant's request for a suppression hearing is reviewed for abuse of discretion. *See, e.g.*, *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992). Under our precedents, "an evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (internal quotation marks omitted). Nevertheless, under certain circumstances an evidentiary hearing need not be held, provided that "in camera procedures will adequately safeguard the defendant's Fourth Amendment rights" and that "accurate resolution of the factual issues would not have been materially advanced by either disclosure of the information to the defendant or an adversary hearing." *United States v. Ajlouny*, 629 F.2d 830, 839 (2d Cir. 1980) (citing *Taglianetti v. United States*, 394 U.S. 316, 317-18 (1969)).

In *Ajlouny*, as here, the defendant moved to suppress evidence obtained through warrantless foreign electronic surveillance. *Id.* at 837-38. In opposition to that motion, the government submitted records of the relevant surveillance to the District Court "ex parte for in camera inspection, with a

13

request not to disclose them to the defendant" because the "disclosure of the sealed materials 'would prejudice the national interest.'" *Id.* at 838. On the basis of the District Court's *in camera*, *ex parte* review of the government's evidence, it denied the defendant's motion, finding that "the statements, though obtained without a warrant, were lawfully recorded during the course of foreign intelligence surveillance of legitimate concern to the national security." *Id.* (internal quotation marks omitted). In an opinion by Judge Newman, we upheld the District Court's decision to deny the defendant's suppression motion without a hearing, "conclud[ing] that the *in camera* procedures employed by [the District Court] in this case were adequate for purposes of determining the lawfulness of the [Federal Bureau of Investigation's ("FBI")] surveillance of the defendant." *Id.* at 839. Significantly, we observed that "[t]he issues of whether the surveillance was conducted for national security and foreign intelligence purposes and whether it was reasonable in scope, were limited in nature and were not dependent on a painstaking search through 'a large volume of factual materials.'" *Id.* (quoting *Alderman v. United States*, 394 U.S. 165, 183-84 (1969)). Other courts of appeals have reached similar conclusions. *See, e.g.*, *United States v. Belfield*, 692 F.2d 141, 149 (D.C. Cir. 1982) (noting that "it has constantly been held that the legality of electronic, foreign intelligence surveillance may, even should, be determined on an *in camera*, *ex parte* basis") (collecting cases).

As in *Ajlouny*, the suppression motion at issue here involved a "limited" factual inquiry into the purpose and scope of the contested surveillance based on evidence relating to national security. As referenced above, the District Court observed that "the issues raised by El-Hage's motion were predominantly legal questions and the fact-based inquiry [into whether the surveillance was conducted for foreign intelligence purposes or law enforcement purposes] was limited." *Bin Laden*, 126 F. Supp. 2d at 287. In addition, the District Court found "persuasive [the government's] arguments about [an] ongoing threat posed by al Qaeda and the potentially damaging impact of disclosure [of the surveillance

14

records] on existing foreign intelligence operations." *Id.* Our own review of the record persuades us of the correctness of the conclusions of the District Court with respect to the limited nature of the inquiry into the purpose of the surveillance and the need, at the time, to keep the government's submissions confidential.

In reaching this conclusion, we do not minimize El-Hage's valid interest in examining the government's evidence and challenging the government's assertions. Nor do we doubt the utility of the adversary process to determine facts or ventilate legal arguments in the normal course. Nevertheless, the imperatives of national security and the capacity of "*in camera* procedures [to] adequately safeguard [El-Hage's] Fourth Amendment rights," *Ajlouny*, 629 F.2d at 839, weighed against holding an evidentiary hearing under these circumstances. *See Belfield*, 692 F.2d at 149 ("[I]n a field as delicate and sensitive as foreign intelligence gathering, as opposed to domestic, criminal surveillance, there is every reason why the court should proceed *in camera* and without disclosure to determine the legality of a surveillance." (internal citation and quotation marks omitted)). Accordingly, we conclude that the District Court's decision to resolve El-Hage's suppression motion without a hearing does not constitute error, much less an abuse of discretion.

**B.     The District Court's Denial of El-Hage's Motion to Suppress Evidence**

1.     Standard of Review

We review *de novo* the legal issues raised on a motion to suppress evidence. *See, e.g.*, *United States v. Rommy*, 506 F.3d 108, 128 (2d Cir. 2007); *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002). We review a district court's factual findings for clear error, viewing the evidence in the light most favorable to the government. *Casado*, 303 F.3d at 443.

2.     Extraterritorial Application of the Fourth Amendment

In order to determine whether El-Hage's suppression motion was properly denied by the

District Court, we must first determine whether and to what extent the Fourth Amendment's safeguards apply to overseas searches involving U.S. citizens. In *United States v. Toscanino*, a case involving a Fourth Amendment challenge to overseas wiretapping of a non-U.S. citizen, we observed that it was "well settled" that "the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens." 500 F.2d 267, 280-81 (2d Cir. 1974); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 283 n.7 (1990) (Brennan, J., dissenting) (recognizing "the rule, accepted by every Court of Appeals to have considered the question, that the Fourth Amendment applies to searches conducted by the United States Government against United States citizens abroad"); *Rosado v. Civiletti*, 621 F.2d 1179, 1189 (2d Cir. 1980) (considering a Fourth Amendment challenge to a search conducted abroad by foreign authorities and observing in dicta that "the Bill of Rights does apply extraterritorially to protect American citizens against the illegal conduct of United States agents" (citing *Reid v. Covert*, 354 U.S. 1 (1957))). Nevertheless, we have not yet determined the specific question of the applicability of the Fourth Amendment's Warrant Clause to overseas searches.[5] Faced with that question now, we hold that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness.

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has explained that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547

---

[5] We interpret the statement in *Toscanino* that "[i]t is no answer to argue that the foreign country which is the situs of the search does not afford a procedure for issuance of a warrant," 500 F.2d at 280, as nothing more than a rejection of the argument that the Fourth Amendment does not apply in foreign countries where U.S. agents cannot obtain local search warrants. In addition, we observe that one of *Toscanino*'s holdings—that aliens may invoke the Fourth Amendment against searches conducted abroad by the U.S. government, 500 F.2d at 280—is no longer valid in light of *Verdugo-Urquidez*, 494 U.S. 259, which we discuss below.

16

U.S. 398, 403 (2006) (internal quotation marks omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* (internal quotation marks omitted); *see also Vernonia Sch. Dist. 47j v. Acton*, 515 U.S. 646, 653 (1995) ("[A] warrant is not required to establish the reasonableness of *all* government searches."); *Katz v. United States*, 389 U.S. 347, 357 (1967) (recognizing exceptions). Familiar exceptions to the warrant requirement arise from exigent circumstances, such as the risk of imminent destruction of evidence or the "hot pursuit" of a fleeing suspect. *See Brigham City*, 547 U.S. at 403. Warrantless searches are also permitted in connection with valid arrests, *see Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) ("[A]n arresting officer may, without a warrant, search a person validly arrested."), and on a consensual basis, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). Custodial "inventory searches" are also exempt from the warrant requirement. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Exceptions have also been established for searches conducted outside of criminal investigations. For example, disciplinary procedures in public schools are not governed by a warrant requirement, *see Acton*, 515 U.S. at 653; neither are civil-service drug-testing programs, *see Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 666-67 (1989), nor are searches conducted at international borders, *United States v. Montoya De Hernandez*, 473 U.S. 531, 537 (1985). Administrative searches, particularly those involving heavily regulated industries, may also be exempt from the warrant requirement under certain circumstances. *See New York v. Burger*, 482 U.S. 691, 708-10 (1987). In these contexts, when the government "seeks to *prevent* the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person" the probable cause and warrant requirements give way to an evaluation of reasonableness. *Nat'l Treasury Employees Union*, 489 U.S. at 668 (emphasis in original).

17

The question of whether a warrant is required for overseas searches of U.S. citizens has not been decided by the Supreme Court, by our Court, or, as far as we are able to determine, by any of our sister circuits. While never addressing the question directly, the Supreme Court provided some guidance on the issue in *United States v. Verdugo-Urquidez*, where the Court examined whether an alien with "no voluntary attachment to the United States" could invoke the protections of the Fourth Amendment to suppress evidence obtained through a warrantless search conducted in Mexico. 494 U.S. 259, 274-75 (1990). Relying on "the text of the Fourth Amendment, its history, and [the Court's] cases discussing the application of the Constitution to aliens and extraterritorially," the Supreme Court held that the Fourth Amendment affords no protection to aliens searched by U.S. officials outside of our borders. *Id.* at 274. With respect to the applicability of the Warrant Clause abroad, the Court expressed doubt that the clause governed any overseas searches conducted by U.S. agents, explaining that warrants issued to conduct overseas searches "would be a dead letter outside the United States."

*Id.* Elaborating on this observation in a concurring opinion, Justice Kennedy concluded:

> The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.

*Id.* at 278. Both Justice Stevens, in a concurring opinion, and Justice Blackmun, in dissent, also took a dim view of applying the Warrant Clause to searches conducted abroad, noting that U.S. judicial officers have no power to issue such warrants. *See id.* at 279 (Stevens, J., concurring) ("I do not believe the Warrant Clause has any application to searches of noncitizens' homes in foreign jurisdictions because American magistrates have no power to authorize such searches."); *id.* at 297 (Blackmun, J., dissenting) ("[A]n American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country."). Accordingly, in *Verdugo-Urquidez*, seven justices of the Supreme Court endorsed the view that U.S.

18

courts are not empowered to issue warrants for foreign searches. *But see id.* at 294-96 (Brennan, J. dissenting) (rejecting this argument).

These observations and the following reasons weigh against imposing a warrant requirement on overseas searches.

First, there is nothing in our history or our precedents suggesting that U.S. officials must first obtain a warrant before conducting an overseas search. El-Hage has pointed to no authority—and we are aware of none—directly supporting the proposition that warrants are necessary for searches conducted abroad by U.S. law enforcement officers or local agents acting in collaboration with them; nor has El-Hage identified any instances in our history where a foreign search was conducted pursuant to an American search warrant.[6] This dearth of authority is not surprising in light of the history of the Fourth Amendment and its Warrant Clause as well as the history of international affairs. As the *Verdugo-Urquidez* Court explained, "[w]hat we know of the history of the drafting of the Fourth Amendment . . . suggests that its purpose was to restrict searches and seizures which might be conducted by the United States in domestic matters." 494 U.S. at 266. In addition, the Warrant Clause appears to have been invested with a meaning at the time of the drafting that differs significantly from our modern view of the requirement. Justice White observed that "at the time of the Bill of Rights, the warrant functioned as a powerful tool of law enforcement rather than as a protection for the rights of criminal suspects," and "it was the abusive use of the warrant power, rather than any excessive zeal in the discharge of peace officers' inherent authority, that precipitated the Fourth Amendment." *Payton v.*

---

[6] We note, however, that pursuant to Army Regulation 190-53, military police seeking to intercept the overseas communications (*i.e.*, obtain a "wiretap") of individuals not subject to the Uniform Code of Military Justice, "may[,] if appropriate, recommend that a judicial warrant be sought from a court of competent jurisdiction." Army Reg. 190-53 § 2-2(b).

While we cannot say that the practices of foreign governments have any bearing on the constitutionality of a similar practice by our government, we find it notable that El-Hage has not pointed to any instance in which another country imposed any comparable requirements on its own law enforcement officers.

*New York*, 445 U.S. 573, 604-14 (1980) (White, J., dissenting) (documenting the history of the Fourth Amendment's warrant requirement). Accordingly, we agree with the Ninth Circuit's observation that "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter." *United States v. Barona*, 56 F.3d 1087, 1092 n.1 (9th Cir. 1995).[7]

Second, nothing in the history of the foreign relations of the United States would require that U.S. officials obtain warrants from foreign magistrates before conducting searches overseas or, indeed, to suppose that all other states have search and investigation rules akin to our own. As the Supreme Court explained in *Verdugo-Urquidez*:

> For better or for worse, we live in a world of nation-states in which our Government must be able to function effectively in the company of sovereign nations. Some who violate our laws may live outside our borders under a regime quite different from that which obtains in this country. Situations threatening to important American interests may arise halfway around the globe, situations which in the view of the political branches of our Government require an American response with armed force. If there are to be restrictions on searches and seizures which occur incident to such American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation.

494 U.S. at 275 (internal citation, quotation marks and brackets omitted). The American procedure of

---

[7] A U.S. citizen who is a target of a search by our government executed in a foreign country is not without constitutional protection—namely, the Fourth Amendment's guarantee of reasonableness which protects a citizen from unwarranted government intrusions. *See* Part II.B.3, *post;* s*ee, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 872-75 (1987); *Michigan v. DeFillippo*, 443 U.S. at 35. Indeed, in many instances, as appears to have been the case here, searches targeting U.S. citizens on foreign soil will be supported by probable cause.

The interest served by the warrant requirement in having a "neutral and detached magistrate" evaluate the reasonableness of a search is, in part, based on separation of powers concerns—namely, the need to interpose a judicial officer between the zealous police officer ferreting out crime and the subject of the search. *Cf. Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963) ("The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause."); *Johnson v. United States*, 333 U.S. 10, 14 (1948) ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers."). These interests are lessened in the circumstances presented here for two reasons. First, a domestic judicial officer's ability to determine the reasonableness of a search is diminished where the search occurs on foreign soil. Second, the acknowledged wide discretion afforded the executive branch in foreign affairs ought to be respected in these circumstances.

A warrant serves a further purpose in limiting the scope of the search to places described with particularity or "the persons or things to be seized" in the warrant. U.S. Const. amend. IV. In the instant case, we are satisfied that the scope of the searches at issue was not unreasonable. *See* Parts II.B.3, *post*.

issuing search warrants on a showing of probable cause simply does not extend throughout the globe and, pursuant to the Supreme Court's instructions, the Constitution does not condition our government's investigative powers on the practices of foreign legal regimes "quite different from that which obtains in this country." *Id.*

Third, if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation. *Cf. The Schooner Exchange v. M'Faddon,* 11 U.S. 116, 135 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself."). As a District Court in this Circuit recently observed, "it takes little to imagine the diplomatic and legal complications that would arise if American government officials traveled to another sovereign country and attempted to carry out a search of any kind, professing the authority to do so based on an American-issued search warrant." *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *52 (S.D.N.Y. Apr. 4, 2007). We agree with that observation. A warrant issued by a U.S. court would neither empower a U.S. agent to conduct a search nor would it necessarily compel the intended target to comply.[8] It would be a nullity, or in the words of the Supreme Court, "a dead letter." *Verdugo-Urquidez*, 494 U.S. at 274.

Fourth and finally, it is by no means clear that U.S. judicial officers could be authorized to issue

---

[8] A warrant represents the delegation of the authority of the government to its agent to execute a search on the property identified therein. The subject of a validly issued search warrant has no right to resist the search. *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."); *United States v. Bullock*, 71 F.3d 171, 176 n.4 (5th Cir. 1995) ("[The subject of a search warrant] had no right to resist execution of a search warrant."); *Gasho v. United States*, 39 F.3d 1420, 1432 n.12 (9th Cir. 1994) ("We recognize that a citizen has no right to resist a search or seizure pursuant to a warrant."); *cf.* 18 U.S.C. § 2231(a) ("Whoever forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties, shall be fined under this title or imprisoned not more than three years, or both."); *id.* § 3109 ("The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.").

21

warrants for overseas searches, *cf. Weinberg v. United States*, 126 F.2d 1004, 1006 (2d Cir. 1942) (statute authorizing district court to issue search warrants construed to limit authority to the court's territorial jurisdiction), although we need not resolve that issue here.

For these reasons, we hold that the Fourth Amendment's Warrant Clause has no extraterritorial application and that foreign searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth Amendment's requirement of reasonableness.[9]

The District Court's recognition of an exception to the warrant requirement for foreign intelligence searches finds support in the pre-FISA law of other circuits. *See United States v. Truong Dinh Hung*, 629 F.2d 908, 913 (4th Cir. 1980); *United States v. Buck*, 548 F.2d 871, 875 (9th Cir. 1977); *United States v. Butenko*, 494 F.2d 593, 605 (3d Cir. 1974); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973). We decline to adopt this view, however, because the exception requires an inquiry into whether the "primary purpose" of the search is foreign intelligence collection. *See Bin Laden*, 126 F. Supp. 2d at 277. This distinction between a "primary purpose" and other purposes is inapt. As the U.S. Foreign Intelligence Surveillance Court of Review has explained:

> [The primary purpose] analysis, in our view, rested on a false premise and the line the court sought to draw was inherently unstable, unrealistic, and confusing. The false premise was the assertion that once the government moves to criminal prosecution, its 'foreign policy concerns' recede. . . . [T]hat is simply not true as it relates to counterintelligence. In that field the government's primary purpose is to halt the espionage or terrorism efforts, and criminal prosecutions can be, and usually are, interrelated with other techniques used to frustrate a foreign power's efforts.

*In re Sealed Case No. 02-001*, 310 F.3d 717, 743 (Foreign Int. Surv. Ct. Rev. 2002).

In addition, the purpose of the search has no bearing on the factors making a warrant requirement inapplicable to foreign searches—namely, (1) the complete absence of any precedent in our history for doing so, (2) the inadvisability of conditioning our government's surveillance on the

---

[9] Because we conclude that the Warrant Clause has no extraterritorial application, we need not reach the questions of whether the searches at issue meet the good faith exception to the exclusionary rule.

22

practices of foreign states, (3) a U.S. warrant's lack of authority overseas, and (4) the absence of a mechanism for obtaining a U.S. warrant. Accordingly, we cannot endorse the view that the normal course is to obtain a warrant for overseas searches involving U.S. citizens unless the search is "primarily" targeting foreign powers.

3.      The Kenyan Searches Were Reasonable and Therefore Did Not Violate the Fourth Amendment.

Turning to the question of whether the searches at issue in this appeal—the search of El-Hage's Nairobi home and the surveillance of his Kenyan telephone lines—were reasonable, we observe that El-Hage does not explicitly contest the District Court's reasonableness determination. It is nevertheless apparent from his briefs on appeal that, in his view, the searches were unreasonable, largely for two reasons. First, El-Hage insists that his Nairobi home deserves special consideration in light of the home's status as "the most fundamental bastion of privacy protected by the Fourth Amendment." El-Hage Br. 220. Second, he contends that the electronic surveillance was far broader than necessary because it encompassed "[m]any calls, if not the predominant amount, [that] were related solely to legitimate commercial purposes, and/or purely family and social matters." *Id.* at 166.

To determine whether a search is reasonable under the Fourth Amendment, we examine the "totality of the circumstances" to balance "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)) (internal quotation marks omitted). As discussed in greater detail below, we conclude that the searches' intrusion on El-Hage's privacy was outweighed by the government's manifest need to monitor his activities as an operative of al Qaeda because of the extreme threat al Qaeda presented, and continues to present, to national security. In light of these circumstances, the Kenyan searches were reasonable, notwithstanding El-Hage's objections, and therefore not prohibited

23

by the Fourth Amendment.

a.    The Search of El-Hage's Home in Nairobi Was Reasonable

El-Hage's principal challenge to the reasonableness of the search of his Nairobi residence appears to derive from Supreme Court precedents applying rigorous scrutiny to searches of a suspect's home. In *Kyllo v. United States*, for example, the Court explained: "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." 533 U.S. 27, 31 (2001) (internal citation and quotation marks omitted). The Supreme Court has expressed this long-held view in numerous other decisions. *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 590 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

This general proscription is not without limits. In *United States v. Knights*, for instance, after balancing the relevant interests, the Court upheld a California statute requiring probationers to submit to searches of their homes, among other locations, regardless of whether the searches are authorized by a warrant or supported by probable cause. 534 U.S. 112, 114, 122 (2001);[10] *see also United States v. Reyes*, 283 F.3d 446, 462 (2d Cir. 2002) ("[T]he probable cause requirements of the Fourth Amendment do not apply to a federal probation officer conducting a home visit—a far less invasive form of supervision than a search—pursuant to a convicted offender's conditions of supervised release.").

_____

[10] Applying the balancing test described above, the Court noted probationers' diminished expectation of privacy in light of their status as probationers and because they had been informed that, under the terms of probation, their homes could be searched without warrants. *Knights*, 534 U.S. at 119-20. Examining the government's interest, the Court observed that it was two-fold: integrating probationers back into the community and preventing them from engaging in further criminal conduct. *Id.* at 120-21. In light of the relative weight of the probationers' and the government's respective interests, the Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house" and therefore upheld the search as reasonable. *Id.* at 212.

24

Accordingly, warrantless searches of homes, while subject to special scrutiny, are nevertheless also subject to a balancing test—weighing an individual's expectation of privacy against the government's need for certain information—for determining reasonableness under the Fourth Amendment. *See, e.g.*, *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

Applying that test to the facts of this case, we first examine the extent to which the search of El-Hage's Nairobi home intruded upon his privacy. The intrusion was minimized by the fact that the search was not covert; indeed, U.S. agents searched El-Hage's home with the assistance of Kenyan authorities, pursuant to what was identified as a "Kenyan warrant authorizing [a search]." *Bin Laden*, 126 F. Supp. 2d at 269. The search occurred during the daytime, *id.* at 285, and in the presence of El-Hage's wife, *id.* at 269. At the conclusion of the search, an inventory listing the items seized during the search was prepared and given to El-Hage's wife. *Id.* at 269. In addition, the District Court found that "[t]he scope of the search was limited to those items which were believed to have foreign intelligence value and retention and dissemination of the evidence acquired during the search were minimized." *Id.* at 285.

As described above, U.S. intelligence officers became aware of al Qaeda's presence in Kenya in the spring of 1996. *Id.* at 268-69. At about that time, they identified five telephone lines used by suspected al Qaeda associates, one of which was located in the same building as El-Hage's Nairobi home; another was a cellular phone used by El-Hage. *Id.* After these telephone lines had been monitored for several months, the Attorney General of the United States authorized surveillance specifically targeting El-Hage. *Id.* That authorization was renewed four months later, and, one month after that, U.S. agents searched El-Hage's home in Nairobi. *Id.* This sequence of events is indicative of a disciplined approach to gathering indisputably vital intelligence on the activities of a foreign terrorist organization. U.S. agents did not breach the privacy of El-Hage's home on a whim or on the basis of

25

an unsubstantiated tip; rather, they monitored telephonic communications involving him for nearly a year and conducted surveillance of his activities for five months before concluding that it was necessary to search his home. In light of these findings of fact, which El-Hage has not contested as clearly erroneous, we conclude that the search, while undoubtedly intrusive on El-Hage's privacy, was restrained in execution and narrow in focus.

Balanced against this restrained and limited intrusion on El-Hage's privacy, we have the government's manifest need to investigate possible threats to national security. As the District Court noted, al Qaeda "declared a war of terrorism against all members of the United States military worldwide" in 1996 and later against American civilians. *Id.* at 269. The government had evidence establishing that El-Hage was working with al Qaeda in Kenya. *Id.* On the basis of these findings of fact, we agree with the District Court that, at the time of the search of El-Hage's home, the government had a powerful need to gather additional intelligence on al Qaeda's activities in Kenya,[11] which it had linked to El-Hage.

Balancing the search's limited intrusion on El-Hage's privacy against the manifest need of the government to monitor the activities of al Qaeda, which had been connected to El-Hage through a year of surveillance, we hold that the search of El-Hage's Nairobi residence was reasonable under the Fourth Amendment.

b. The Surveillance of El-Hage's Kenyan Telephone Lines Was Also Reasonable.

El-Hage appears to challenge the reasonableness of the electronic surveillance of the Kenyan telephone lines on the grounds that (1) they were overbroad, encompassing calls made for commercial, family or social purposes and (2) the government failed to follow procedures to "minimize" surveillance. Indeed, pursuant to defense counsel's analysis, "as many as 25 percent of the calls were

---

[11] On the recognized threat posed by al Qaeda in the 1990s, *see In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008).

either made by, or to" a Nairobi businessman not alleged to have been associated with al Qaeda. El-Hage Br. 166. El-Hage also criticizes the government for retaining transcripts of irrelevant calls—such as conversations between El-Hage and his wife about their children—despite the government's assurance to the District Court that the surveillance had been properly "minimized." *See United States v. Ruggiero*, 928 F.2d 1289, 1302 (2d Cir. 1991) ("[A]ny [electronic] interception 'shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.'" (quoting 18 U.S.C. § 2518(5))).

It cannot be denied that El-Hage suffered, while abroad, a significant invasion of privacy by virtue of the government's year-long surveillance of his telephonic communications. The Supreme Court has recognized that, like a physical search, electronic monitoring intrudes on "the innermost secrets of one's home or office" and that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63 (1967); *cf. Katz v. United States*, 389 U.S. 347, 352-54 (1967). For its part, the government does not contradict El-Hage's claims that the surveillance was broad and loosely "minimized." Instead, the government sets forth a variety of reasons justifying the breadth of the surveillance. These justifications, regardless of their merit, do not lessen the intrusion El-Hage suffered while abroad, and we accord this intrusion substantial weight in our balancing analysis.

Turning to the government's interest, we encounter again the self-evident need to investigate threats to national security presented by foreign terrorist organizations. When U.S. intelligence learned that five telephone lines were being used by suspected al Qaeda operatives, *see Bin Laden*, 126 F. Supp. 2d at 286, the need to monitor communications traveling on those lines was paramount, and we are loath to discount—much less disparage—the government's decision to do so.

Our balancing of these compelling, and competing, interests turns on whether the scope of the

27

intrusion here was justified by the government's surveillance needs. We conclude that it was, for at least the following four reasons.

First, complex, wide-ranging, and decentralized organizations, such as al Qaeda, warrant sustained and intense monitoring in order to understand their features and identify their members. *See In re Sealed Case No. 02-001*, 310 F.3d 717, 740-41 (Foreign Int. Surv. Ct. Rev. 2002) ("Less minimization in the acquisition stage may well be justified to the extent . . . 'the investigation is focusing on what is thought to be a widespread conspiracy[,] [where] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.'" (quoting *Scott v. United States*, 436 U.S. 128, 140 (1978) (alteration in original))); *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987) ("Where, as here, an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith."); *United States v. Scott*, 516 F.2d 751, 758 (D.C. Cir. 1975) (Because the targets "were operating a fairly extensive narcotics business," the court of appeals determined that "thorough surveillance of their activities was necessary to disclose the extent of their conspiracy and the identity of the conspirators.").

Second, foreign intelligence gathering of the sort considered here must delve into the superficially mundane because it is not always readily apparent what information is relevant. *Cf. United States v. Rahman*, 861 F. Supp. 247, 252-53 (S.D.N.Y. 1994) (recognizing the "argument that when the purpose of surveillance is to gather intelligence about international terrorism, greater flexibility in acquiring and storing information is necessary, because innocent-sounding conversations may later prove to be highly significant, and because individual items of information, not apparently significant when taken in isolation, may become highly significant when considered together over time").

Third, members of covert terrorist organizations, as with other sophisticated criminal

enterprises, often communicate in code, or at least through ambiguous language. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 108 (2d Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); *United States v. Casamento*, 887 F.2d 1141, 1190 (2d Cir. 1989) (recognizing that conspirators in a complex narcotics scheme spoke in code); *Hoffman*, 832 F.2d at 1308; *United States v. Truong Dinh Hung*, 629 F.2d 908, 917 (4th Cir. 1980) ("[W]hen the government eavesdrops on clandestine groups like this one, investigators often find it necessary to intercept all calls in order to record possible code language or oblique references to the illegal scheme."); *Scott*, 516 F.2d at 758 ("[T]he conspirators used coded language and would occasionally discuss irrelevant matters at the outset of a conversation."); *cf. Scott v. United States*, 436 U.S. 128, 140 (1978) (observing that evaluations of whether surveillance has been properly minimized require consideration of the particular circumstances of the wiretap). Hence, more extensive and careful monitoring of these communications may be necessary.

Fourth, because the monitored conversations were conducted in foreign languages, the task of determining relevance and identifying coded language was further complicated. *See In re Sealed Case*, 310 F.3d at 741; *cf. In re Audibility of Certain Recorded Conversations*, 691 F. Supp. 588 (D. Conn. 1988) (discussing difficulties inherent in making audibility determinations of evidence recorded in a language other than English); *cf.* 18 U.S.C. § 2518(5) ("In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.").

Because the surveillance of suspected al Qaeda operatives must be sustained and thorough in order to be effective, we cannot conclude that the scope of the government's electronic surveillance was overbroad. While the intrusion on El-Hage's privacy was great, the need for the government to so

intrude was even greater. Accordingly, the electronic surveillance, like the search of El-Hage's Nairobi residence, was reasonable under the Fourth Amendment.

In sum, because the searches at issue on this appeal were reasonable, they comport with the applicable requirement of the Fourth Amendment and, therefore, El-Hage's motion to suppress the evidence resulting from those searches was properly denied by the District Court.

### III.    CONCLUSION

To summarize, we hold:

(1) The evidence obtained from the search of El-Hage's Kenyan residence and the surveillance of his Kenyan telephone lines was properly admitted at trial because (a) the Fourth Amendment's requirement of reasonableness—but not the Warrant Clause—applies to extraterritorial searches and seizures of U.S. citizens, and (b) the searches of El-Hage's Kenyan home and the surveillance of his telephone lines were reasonable under the circumstances presented here; and

(2) The District Court's *ex parte*, *in camera* evaluation of evidence submitted by the government in opposition to El-Hage's suppression motion was appropriate in light of national security considerations that militated in favor of maintaining the confidentiality of that evidence.

For these reasons, and for those set forth in *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008), the judgment of conviction entered by the District Court against El-Hage is **AFFIRMED** in all respects except that the sentence is **VACATED**, and the case is **REMANDED** to the District Court for the sole purpose of resentencing El-Hage as directed in *In re Terrorist Bombings of U.S. Embassies in East Africa*,, __ F.3d __ (2d Cir. 2008).