In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2734

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES TODD STOKES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 CR 590-1 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED MARCH 28, 2012 — DECIDED AUGUST 1, 2013

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Charles Todd Stokes was convicted in Florida state court of misdemeanor battery for indecently touching two boys at the elementary school where he was a teacher. A month later, for reasons unknown, Florida authorities permitted him to move to Thailand where he immediately began enticing adolescent and prepubescent boys for sex. This went on for several years until someone tipped off the

U.S. Immigration and Customs Enforcement Service ("ICE"). In a joint operation with the Royal Thai Police, ICE agents searched Stokes's home and recovered a camera, a computer, and several compact discs containing thousands of images of Stokes's sexual activity with Thai boys.

Stokes was extradited to the United States and convicted of traveling in foreign commerce for the purpose of engaging in a sex act with a minor. *See* 18 U.S.C. § 2423(b). Stokes appeals, raising no fewer than ten claims of error. None are meritorious. We concentrate our efforts on two: a procedural mistake in the extradition process and a challenge to the legality of the search.

The extradition error involves the Rule of Specialty, which holds that a nation securing the return of a person pursuant to an extradition treaty may prosecute the extradited person only for the crime or crimes named in the surrendering country's extradition grant. Thailand surrendered Stokes to face a charge under 18 U.S.C. § 2423(c), which makes it a crime for U.S. citizens and lawful permanent residents to engage in illicit sexual conduct in a foreign place. Prosecutors later shifted gears and prosecuted him for violating 18 U.S.C. § 2423(b), a similar crime but not the one on which Thailand granted extradition. On a request from the American Embassy, however, the Thai foreign ministry waived the Rule of Specialty. This diplomatic action cleared the way for the government to proceed on the substitute charge.

The challenge to the search raises two questions: (1) whether an extraterritorial search of an American citizen by U.S. agents is subject to the Fourth Amendment's implicit warrant requirement and the explicit requirements of the

Warrant Clause; and (2) whether the search by ICE agents was reasonable. Following the Second Circuit, we hold that the Fourth Amendment's warrant requirement and the Warrant Clause have no extraterritorial application. *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 171 (2d Cir. 2008). But Stokes remains protected by the Amendment's touchstone requirement of reasonableness. *See id.* at 170 n.7. Because the search was reasonable, the photographic evidence was properly admitted at trial.

## I. Background

Stokes was a teacher in the Miami-Dade public schools for more than a decade. On February 25, 2000, he pleaded no contest to a charge of misdemeanor battery for indecently touching two boys who were his students. A Florida court suspended sentence and placed Stokes on probation. As a condition of his probation, Stokes had to surrender his Florida teaching license and was barred from unsupervised contact with minors absent written court permission. Less than a month after his plea and sentencing, Stokes asked for permission to complete his probation in Thailand. For reasons not specified in the record, this request was granted. On March 21, 2000, Stokes moved to Thailand, eventually settling in Pattaya, about 200 kilometers south of Bangkok.

Within two weeks of his arrival in Thailand, Stokes began seeking boys for sex. He frequently hired young male prostitutes. He enticed runaways and other boys off the streets to his home to play video games, and once there, he engaged in sexual acts with them. He often photographed these sexual

encounters, transferring the images from his camera to a computer and compact discs.

This conduct continued undetected for several years. With the exception of a three-week trip to the United States from December 25, 2001 to January 14, 2002, Stokes resided continuously in Thailand from March 21, 2000, until his arrest on July 28, 2006. He supported himself by teaching English. In December 2002 ICE agents based in Thailand received a tip that Stokes had been fired from a teaching job in Bangkok for indecently touching male students. The agents opened an investigation and learned that Stokes had been fired from another teaching job at a different school based on similar allegations. This prompted ICE to request assistance from the Royal Thai Police in Pattaya.

Thai Police assigned narcotics officers to the investigation because surveillance was anticipated and the narcotics officers worked in plain clothes. The Thai officers eventually obtained a warrant authorizing a search of Stokes's home "to locate and seize any illegal items and narcotics … of which possession is considered illegal, or which was illegally obtained, or which has been used or is intended to be used to commit a crime." Because this was a sex-crimes investigation, the inclusion of narcotics among the objects of the search was an obvious anomaly probably attributable to the presence of the local narcotics officers on the joint law-enforcement team.

Early in the morning of October 9, 2003, ICE agents and the Royal Thai Police executed the warrant at Stokes's home. Stokes was not there when they arrived, so they waited for him before entering. Once the search was underway, the officers

recovered a digital camera, multiple compact discs, and a computer. Together, these items contained more than 6,000 images of Stokes's sexual activity with adolescent and prepubescent Thai boys.

Despite the voluminous evidence of serious crimes, Stokes was not arrested until July 28, 2006, almost three years after the search. It took another year to return him to the United States. On July 26, 2007, Thailand granted an extradition request from the United States and returned Stokes to Miami to face a charge of violating 18 U.S.C. § 2423(c), which makes it a crime for U.S. citizens and lawful permanent residents to travel in foreign commerce and engage in illicit sexual conduct. But that particular subsection of § 2423 was enacted *after* Stokes traveled to Thailand and therefore did not apply to his conduct. Federal prosecutors in Miami soon realized their mistake and dropped the charge. Stokes was transferred to the Northern District of Illinois and indicted on three counts of violating 18 U.S.C. § 2251A(b)(2)(A), a child-trafficking statute.[1] Prosecutors dismissed these charges as well and eventually indicted Stokes on a single count of violating 18 U.S.C. § 2423(b), which at the relevant time prohibited traveling in interstate or foreign commerce for the purpose of engaging in a sexual act with a person under 18. *See* 18 U.S.C. § 2423(b) (effective Oct. 30, 1998 to Nov. 2, 2002).

---

[1] More specifically, 18 U.S.C. § 2251A(b)(2)(A) provides: "Whoever purchases or otherwise obtains custody or control of a minor, … with intent to promote … the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct … shall be punished by imprisonment for not less than 30 years or for life … ."

Stokes moved to suppress the evidence recovered in the search of his home in Thailand. In a comprehensive opinion, the district court denied the motion. *United States v. Stokes*, 710 F. Supp. 2d 689 (N.D. Ill. 2009). The judge first held that the Fourth Amendment's warrant requirement and Warrant Clause do not apply overseas. *Id.* at 697–70. Next, after considering all the circumstances, the judge found that the search was reasonable. *Id.* at 701–02. Finally, the judge held that even if the search violated the Fourth Amendment, ICE agents relied in good faith on Thai legal authorities. *Id.* at 702–03.

After a flurry of additional defense motions, all unsuccessful, the case was tried to a jury. The government introduced testimony from the ICE agents involved in the investigation and two Thai boys who were sexually assaulted by Stokes. One of the victims was a street kid nicknamed "Ice," who was 11 years old when Stokes first enticed him to his home with a promise of video games and a place to sleep. "Ice" testified that Stokes subjected him to various sex acts and gave him money. He recalled approximately 20 such sexual encounters with Stokes. The other victim was a runaway nicknamed "Note," who also was 11 when he first accepted Stokes's invitation to accompany him home. "Note" testified to a similar pattern of sexual abuse by Stokes.

Finally, the government introduced a representative sample of the more than 6,000 photographic images recovered during the search of Stokes's home. The photographs depicted Stokes engaged in various sex acts with Thai boys, including "Ice" and "Note." An ICE agent testified that approximately 70 different boys appear in the images, 60 of whom appeared to be under 16. Of those, 30 appeared to be under the age of 12, and the

youngest looked to be about 7. Several hundred of these photos were transferred from Stokes's camera to compact discs in the months immediately before and after Stokes's brief trip to the United States and return to Thailand in December 2001 to January 2002.

The jury found Stokes guilty. The district judge sentenced him to 15 years in prison, the maximum penalty. Stokes timely appealed.

## II. Discussion

Stokes has taken a scattershot approach to his appeal, raising ten separate issues, some of which have subparts. We take this opportunity to reiterate some advice we've given before: "Losers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better. … [T]he shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution." *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir. 1996) (Evans, J.); *see also Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for reversing the district court, that usually means there are none."). Most of Stokes's arguments are frivolous or so obviously meritless that we need only address them summarily. Two require more complete discussion.

### A. Rule of Specialty

Stokes argues that the Rule of Specialty barred the government from prosecuting him for violating § 2423(b) because he

was extradited for a violation of § 2423(c), a different crime. The Rule of Specialty, a treaty-law doctrine, holds that a nation seeking return of a person under the terms of an extradition treaty may prosecute the extradited person only to the extent expressly authorized by the surrendering nation in the grant of extradition. *See United States v. Warda*, 285 F.3d 573, 575–76 (7th Cir. 2002) ("[T]he Rule of Specialty … does not allow the country to which an individual is extradited to prosecute that person for a crime unless the extraditing nation has expressly authorized such a prosecution."). Article 14 of the extradition treaty between the United States and Thailand incorporates the rule:

> (1) A person extradited under this Treaty shall not be detained, tried, or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted … , *unless*:
>
> … .
>
> (c) the Requested State has consented to detention, trial, or punishment of that person for an offense other than that for which extradition was granted, or to extradition to a third State. …

Extradition Treaty with Thailand, U.S.-Thailand, art. 14, Dec. 14, 1983, S. TREATY DOC. No. 98–16 (1984), *available at* 1983 U.S.T. LEXIS 418 (entered into force May 17, 1991) (emphasis added). As we will see, the "unless" clause is important here.

Stokes was extradited on a charge of engaging in illicit sexual conduct in a foreign place in violation of 18 U.S.C. § 2423(c). Adopted as part of the 2003 PROTECT Act, this statute provides that "[a]ny United States citizen … who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be … imprisoned not more than 30 years." *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108–21, 117 Stat. 650 (amending 18 U.S.C. § 2423 and adding subsection (c)). However, because Stokes's last travel to Thailand occurred in January 2002, § 2423(c) could not be applied to his conduct. *See United States v. Jackson*, 480 F.3d 1014, 1018, 1024 (9th Cir. 2007) (holding that § 2423(c) does not apply to travel occurring prior to the enactment of the statute and thus finding no need to consider ex post facto argument).

Prosecutors in Miami quickly realized the mistake and moved to dismiss the § 2423(c) charge. Stokes was then transferred to the Northern District of Illinois, and the government indicted him on three counts of violating § 2251A(b), which prohibits child trafficking. This, too, was a charging misfire, and the charges were dismissed. The government eventually obtained an indictment charging Stokes with a single violation of § 2423(b), which at the relevant time prohibited traveling in interstate or foreign commerce for the purpose of engaging in a sexual act with a person under the age of 18.

Stokes insists that the Rule of Specialty barred the government from prosecuting him on the substitute charge. The government responds that Stokes lacks standing to assert a

violation of the Rule of Specialty, relying on authority from this court holding that extradition treaties govern diplomatic relations only and do not create enforceable personal rights. *See United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) ("[E]xtradition treaties do not create personal rights enforceable by criminal defendants. … Instead they create rules for the relations between nations." (citing *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990))).

On the face of it, *Burke* appears to foreclose further inquiry into the Rule of Specialty. But there is reason to question this circuit precedent. In *United States v. Rauscher*, 119 U.S. 407 (1886), the Supreme Court recognized and enforced the Rule of Specialty in a prosecution of an American seaman captured by Great Britain on the high seas and surrendered to the United States to face a charge of murder under the terms of the extradition treaty between the two countries. After extradition the government tried and convicted the seaman on a different charge: infliction of cruel and unusual punishment. The Supreme Court enforced the doctrine of specialty derived from treaty law, explaining that

> [a] treaty … is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And, when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

*Id.* at 419. Under the extradition treaty then in effect between the United States and Great Britain, murder was an extraditable offense but the substitute crime, infliction of cruel and unusual punishment, was not. Applying the Rule of Specialty, the Court held that a person brought within the jurisdiction of the court under an extradition treaty

> can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings.

*Id.* at 430.

Our decision in *Burke* is hard to square with *Rauscher*, which though old remains good law today. *See United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992) (recognizing the continued applicability of *Rauscher*, but distinguishing it where the presence of the defendant was secured by forcible abduction rather than extradition). Indeed, we have specifically acknowledged *Rauscher*'s holding in another case, though not one raising an extradition question. *See Jogi v. Voges*, 480 F.3d 822, 831 (7th Cir. 2007) (citing *Rauscher* as holding that the Rule of Specialty in an extradition treaty may be asserted as a defense to a prosecution for a crime other than the one on which extradition was based). Several of our sister circuits have specifically held that criminal defendants have standing to raise a violation of the Rule of Specialty. *See, e.g., United States*

*v. Puentes*, 50 F.3d 1567, 1574 (11th Cir. 1995) ("We believe that *Rauscher* clearly confers such a right on the extradited defendant."); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990) ("Levy has standing to raise the issue."); *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir. 1988) ("A person extradited may raise whatever objections the extraditing country would have been entitled to raise."); *United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987) ("[The defendant] may raise whatever objections to his prosecution that Monaco might have." (citing *Rauscher*, 119 U.S. at 419)).

Although we question whether *Burke* can be reconciled with *Rauscher*, *Jogi*, and the authority from other circuits, we do not need to resolve the matter here. It is well-established that the Rule of Specialty may be waived by the surrendering country. *See United States v. Tse*, 135 F.3d 200, 205 (1st Cir. 1998) ("If Hong Kong consented to the prosecution[,] … Tse's position must fail."); *Puentes*, 50 F.3d at 1575 ("As a sovereign, the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such an action."); *Thirion*, 813 F.2d at 151 ("While the asylum country may consent to extradite the defendant for offenses other than those expressly enumerated in the treaty, … it did not do so here."); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) ("[T]he protection [of specialty] exists only to the extent that the surrendering country wishes."). As we have noted, the extradition treaty between the United States and Thailand expressly provides for waivers of the Rule of Specialty, and diplomatic authorities in the two nations invoked that waiver procedure here.

On December 8, 2008, the Thai Ministry of Foreign Affairs issued a communiqué to the United States Embassy expressly stating that Thailand

> consents to the waiver of the rule of speciality, viz., to the detention, trial, and punishment of Mr. Charles Todd Stokes for an offence under Title 18 of the United States Code, Section 2423(b) which is technically different from Title 18 of the United States Code, Section 2423(c) for which the extradition was granted.

Stokes argues that we cannot rely on Thailand's waiver absent further inquiry into how it was obtained. To the contrary, Thailand's waiver of the Rule of Specialty is conclusive on the question. *Tse*, 135 F.3d at 205; *Puentes*, 50 F.3d at 1575 ("The extradited individual … enjoys [the Rule of Specialty] right at the sufferance of the requested nation. As a sovereign, the requested nation may waive its right to object to a treaty violation … ."). Further inquiry is unnecessary.

## B. The Search of Stokes's Home in Thailand

Stokes also challenges the district court's decision denying his motion to suppress the photographic evidence recovered in the search of his home in Pattaya. The photographs led to the identification of the two Thai victims who testified against him, and the government introduced a representative sample of the photographs at trial. In denying suppression the district judge concluded that the Fourth Amendment generally applied but

the Amendment's warrant requirement and Warrant Clause did not. The judge also found the search reasonable under all the circumstances. Alternatively, the judge held that even if the search violated the Fourth Amendment, the exclusionary rule would not apply because the ICE agents relied in good faith on Thai law-enforcement authorities. We review the district court's decision under a split standard of review; factual findings are reviewed for clear error, and legal conclusions and the ultimate determination of reasonableness are subject to de novo review. *United States v. Uribe*, 709 F.3d 646, 649 (7th Cir. 2013).

### 1. *Extraterritorial Application of the Fourth Amendment*

Evidence obtained in a search of an American citizen by foreign authorities operating within their own country is generally admissible in the courts of the United States even if the search does not otherwise comply with our law, including the law of the Fourth Amendment. *See United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009) ("The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country."); *United States v. Barona*, 56 F.3d 1087, 1096 (9th Cir. 1995); *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987); *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976). But if U.S. agents substantially participate in an extraterritorial search of a U.S. citizen and the foreign officials were essentially acting as agents for their American counterparts or the search amounted

to a joint operation between American and foreign authorities, the Fourth Amendment generally applies. *See Emmanuel*, 565 F.3d at 1330; *Barona*, 56 F.3d at 1096; *Peterson*, 812 F.2d at 490; *cf. United States v. Marzano*, 537 F.2d 257, 269–71 (7th Cir. 1976) (holding that FBI agents who merely supplied information to Grand Cayman police and observed but did not participate in the search by authorities in that country did not trigger Fourth Amendment protection).

The district court held that because the ICE agents initiated the investigation of Stokes and fully participated in the search of his home, the search was a joint operation between American and Thai authorities and "some measure" of Fourth Amendment protection applied. *Stokes*, 710 F. Supp. 2d at 697. The government does not contest this ruling, for good reason. On these facts we agree with the district court that the Fourth Amendment generally applies.

That conclusion, however, does not answer the more precise question about the extraterritorial reach of the Amendment's warrant requirements. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Stokes argues that the Thai warrant violated the Warrant Clause because it did not describe the

items to be seized with particularity and the search exceeded the scope of the warrant. There is no question that the warrant used very general language. Stokes's argument thus requires us to decide whether an extraterritorial search by U.S. agents is subject to the Warrant Clause.

The Warrant Clause is phrased as a limitation on the power to issue warrants and is distinct from the Fourth Amendment's "warrant requirement," which though not expressed in the text of the Amendment is implied as a matter of long-standing Supreme Court doctrine.[2] *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, this Court has inferred that a warrant must generally be secured."); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("searches and seizures inside a home without a warrant are presumptively unreasonable"); *Payton v. New York*, 445 U.S. 573, 586–87 (1980). The Supreme Court has never addressed whether the Warrant Clause or the doctrinal requirement of a warrant applies extraterritorially. Nor have we.

---

[2] Because warrants immunized government agents against liability for trespass, the Fourth Amendment's Warrant Clause aimed to limit their availability by imposing explicit requirements on their issuance. *See* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 68–76 (1998); Akhil Reed Amar, *Fourth Amendment First Principles*, 107 HARV. L. REV. 757, 761–81 (1994); William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 YALE L.J. 393, 409–10 (1995). The "warrant requirement" in modern Fourth Amendment doctrine arises by implication and operates as a general presumption that warrantless searches are unreasonable, subject to certain well-established exceptions. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *Payton v. New York*, 445 U.S. 573, 586–87 (1980).

The Supreme Court's reasoning in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), sheds some light on the question. In *Verdugo-Urquidez* the Court held that the Fourth Amendment has no application to a warrantless search by U.S. agents of a nonresident alien's property located in a foreign country—there, Mexico. *Id.* at 261. The Court based its holding on "the text of the Fourth Amendment, its history, and [the Court's] cases discussing the application of the Constitution to aliens and extraterritorially." *Id.* at 274. Because the Amendment did not apply at all, the Court had no need to separately address whether the warrant requirement and the Warrant Clause applied to foreign searches by American agents. But the Court noted in passing that any warrant issued by a judicial officer in this country "would be a dead letter outside the United States." *Id*. Justice Kennedy's concurring opinion was more direct:

> The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.

*Id.* at 278 (Kennedy, J., concurring). Justice Stevens echoed the point in his concurrence, as did Justice Blackmun in dissent. *See id.* at 279 (Stevens, J., concurring in the judgment) ("I do not believe the Warrant Clause has any application to searches of noncitizens' homes in foreign jurisdictions because American

magistrates have no power to authorize such searches."); *id.* at 297 (Blackmun, J., dissenting) ("[A]n American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country.").

Among the circuit courts of appeals, only the Second has addressed whether the Fourth Amendment's warrant requirement applies to searches conducted by U.S. agents overseas, concluding that it does not. *See In re Terrorist Bombings*, 552 F.3d at 167 ("[W]e hold that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness."). The Second Circuit took its cues from *Verdugo-Urquidez*, in which no fewer than "seven justices of the Supreme Court endorsed the view that U.S. courts are not empowered to issue warrants for foreign searches." *Id.* at 169.

Beyond reading the clear signals from the Supreme Court in *Verdugo-Urquidez*, the Second Circuit noted the absence of any historical support for the argument that the Fourth Amendment's warrant requirement applies to searches carried out by U.S. agents overseas. *Id.* ("[T]here is nothing in our history or our precedents suggesting that U.S. officials must first obtain a warrant before conducting an overseas search."). The court also considered the foreign-policy implications of extending the warrant requirement to extraterritorial searches, noting that "nothing in the history of the foreign relations of the United States would require that U.S. officials obtain warrants from foreign magistrates … or, indeed, to suppose that all

other states have search and investigation rules akin to our own." *Id.* at 170.

Finally, the court returned to the basic difficulty that "if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation." *Id.* at 171. And "it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches." *Id*. For these reasons, the court concluded that "the Fourth Amendment's Warrant Clause has no extraterritorial application," and "foreign searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth Amendment's requirement of reasonableness." *Id.*

Stokes has no response to *In re Terrorist Bombings*. Nor does he grapple with the clear implication of the Supreme Court's statements in *Verdugo-Urquidez*. We agree with the Second Circuit's reasoning and now hold that the Fourth Amendment's warrant requirement, and by extension the strictures of the Warrant Clause, do not apply to extraterritorial searches by U.S. agents. The search of Stokes's home in Thailand is governed by the Amendment's basic requirement of reasonableness, *see In re Terrorist Bombings*, 552 F.3d at 170 n.7, to which we now turn.

### 2. *Reasonableness of the Search*

Whether a search is reasonable under the Fourth Amendment depends on the totality of the circumstances and requires the court to weigh the intrusion on individual privacy against

the government's need for information and evidence. *Samson v. California*, 547 U.S. 843, 848 (2006). On the individual side of the ledger, the privacy of the home is central to the Fourth Amendment right. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001). Against that core individual right is the government's strong interest in preventing the sexual exploitation of children.

In finding the search reasonable, the district court was heavily influenced by the fact that the joint investigation by ICE and the Royal Thai Police had produced information that "almost certainly" would have been sufficient to establish probable cause that Stokes had committed a crime and evidence of it would be found in his home. *Stokes*, 710 F. Supp. 2d at 701. We agree but omit the qualifier "almost." Probable cause requires a commonsense "assessment of probabilities in particular factual contexts," *Illinois v. Gates*, 462 U.S. 213, 232 (1983), and here the district court marshaled the compelling evidence supporting probable cause:

> Stokes had been fired from two Thai schools in one year for touching children inappropriately. His colleagues at a third school told investigators that he continued to engage in similar behavior. Stokes had a history of sexually assaulting children[] and a criminal conviction for inappropriately touching a child in the United States. He was seen regularly hugging and kissing one particular male student. Two credible informants separately indicated that Stokes, an unmarried, middle-aged man, intimated that he was sexually attracted to children and boasted about living

> with young Thai boys. ICE Investigators also verified through cooperation with Thai authorities that a witness had, on at least one occasion, seen young boys reporting to Stokes's private quarters.

*Stokes*, 710 F. Supp. 2d at 701.

Moreover, the search was executed in a reasonable manner. The law-enforcement team acted pursuant to a valid Thai search warrant. The search took place during the daytime hours. Although Stokes was not at home when the officers arrived early in the morning, they waited for him before entering the home. Stokes was not restrained during the search, containers were not broken open, and Stokes received an inventory of the items seized. The entire search lasted only about two hours. In the district court's view, "Thai and U.S. officials acted reasonably to minimize the intrusiveness of the search." *Id.* at 702. Again, we agree. Because the search of Stokes's home was reasonable, the district court properly denied suppression of the evidence recovered there.

## C. Remaining Claims

Stokes raises a bevy of additional arguments, some downright frivolous and the rest simply meritless. We move through the remaining issues with more dispatch.

### 1. *Commerce Clause Challenge to 18 U.S.C. § 2423(b)*

Relying on *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), Stokes argues that § 2423(b) exceeds Congress's power under the Commerce Clause.[3] Neither *Lopez* nor *Morrison* is helpful here. In *Lopez* the Supreme Court explained that Congress is authorized under the Commerce Clause to regulate three categories of activity: (1) the use of the channels of interstate commerce; (2) the use of the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that have a substantial relation to interstate commerce (that is, that substantially affect interstate commerce). *See Lopez*, 514 U.S. at 558–59. *Lopez* and *Morrison* raised questions about the limits of the third category—the "substantial effects" power—but § 2423(b) fits comfortably within the first category, the "channels power." The statute makes it a crime to travel in interstate or foreign commerce "for the purpose of engaging in any sexual act … with a person under 18 years of age." 18 U.S.C. § 2423(b) (effective Oct. 30, 1998 to Nov. 1, 2002).

In keeping with these general principles, several circuits have held that § 2423(b) is a proper exercise of the channels power. *See, e.g.*, *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006); *United States v. Han*, 230 F.3d 560, 562–63 (2d Cir. 2000). It's worth emphasizing here that Stokes's case does not implicate the usual federalism concerns that animate most Commerce Clause challenges. "Foreign commerce is

---

[3] The Commerce Clause provides: "The Congress shall have Power … To regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes … ." U.S. CONST. art. 1, § 8, cl. 3.

pre-eminently a matter of national concern." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979). In this regard, the Fifth Circuit has affirmed a conviction under § 2423(b) on almost identical facts. *See United States v. Bredimus*, 352 F.3d 200, 208 (5th Cir. 2003). In *Bredimus* the defendant was convicted of traveling to Thailand for the purpose of engaging in sexual acts with minors. *Id.* at 201. The court rejected the defendant's Commerce Clause challenge to § 2423(b). *Id.* at 204–08.

Relatedly, Stokes contends that § 2423(b) is unconstitutional because it criminalizes "mere thought" in interstate or foreign commerce. Not so. The statute targets the use of the channels of interstate and foreign commerce for a particular illicit purpose—the purpose of engaging in a sexual act with a minor—and not just "mere thought" in interstate or foreign commerce. As the First Circuit noted in rejecting a similar argument, "[p]roof of intent naturally means proving state of mind, but that does not mean that one is punishing 'mere thought' any more than that the requirement of proving *mens rea* in most crimes means that one is solely punishing 'mere thought.' " *United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998). Section 2423(b) lies well within Congress's power under the Commerce Clause.

### 2. *Vagueness Challenge to 18 U.S.C. § 2423(b)*

Stokes also contends that § 2423(b) is unconstitutionally vague. This argument requires an examination of the full text of § 2423(b) as it stood at the time of Stokes's travel:

> A person who travels in interstate commerce, or conspires to do so, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, or conspires to do so, for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 15 years, or both.

18 U.S.C. § 2423(b) (effective Oct. 30, 1998 to Nov. 1, 2002). Stokes focuses on the phrase "sexual act … with a person under 18 years of age that would be in violation of chapter 109A." He claims that this cross-reference renders the statute unconstitutionally vague because some of the crimes listed in chapter 109A (18 U.S.C. §§ 2241–2244) involve victims under the age of 16, making the age requirements contradictory and confusing.

Stokes's vagueness challenge sounds in the Fifth Amendment's guarantee of due process. "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited … .' " *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see also United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012) ("Vagueness doctrine rests on concerns about fair notice and arbitrary enforcement."); *United States v. Plummer*, 581 F.3d 484, 488 (7th

Cir. 2009) (A statute is unconstitutionally vague if it " 'does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited.' " (quoting *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006))).

With respect to the intended victim's age, the version of § 2423(b) under which Stokes was convicted has two basic requirements: (1) the sought-after victim must be a person under 18 years of age; and (2) the intended conduct must qualify as an offense under chapter 109A if the conduct had taken place within the special maritime and territorial jurisdiction of the United States. Chapter 109A creates a series of sex crimes, some of which do not contain victim-age requirements at all and some of which pertain only to minor victims under the age of 16. For example, under 18 U.S.C. § 2241(a), which defines aggravated sexual assault, it is a federal crime to cause another to engage in a sexual act by the use of force or threat if the conduct occurs in the special maritime and territorial jurisdiction of the United States. Section 2241(c), a different subsection of the same statute, criminalizes sexual acts with a person under the age of 12 within the same jurisdictional limits. Under § 2243(a) it is a federal crime to engage in a sexual act with a person older than 12 but younger than 16 within the same jurisdictional limits *if* the perpetrator is at least four years older than the victim.[4]

The cross-reference, though perhaps awkwardly phrased, does not introduce confusion. Together, § 2423(b) and the

---

[4] There are other crimes listed in chapter 109A, but they are not relevant to Stokes's argument.

crimes listed in chapter 109A criminalize interstate and foreign travel undertaken for any of the following purposes: (1) engaging in a sexual act with a minor under the age of 12, *see* § 2241(c); (2) engaging in a sexual act with a minor between the ages of 12 and 16 *if* the perpetrator is at least four years older than the victim, *see* § 2243(a); and (3) engaging in a sexual act with a minor between the ages of 16 and 18 by the use of force or threat, *see* § 2241(a). The statute is not unconstitutionally vague.[5]

### 3. *Evidentiary Claims*

#### i. *Other-acts evidence under Rules 404(b), 413, and 414*

Stokes objects to the admission at trial of his 2000 Florida conviction for molesting two boys and the testimonial and

---

[5] Stokes also argues that the indictment was unconstitutionally vague. The indictment closely tracked the language of 18 U.S.C. § 2423(b), so this argument overlaps with the challenge to the statute. Because the statute is not unconstitutionally vague, the indictment isn't either. And the indictment was otherwise legally sufficient. An indictment

> must accomplish three functions: [I]t must state each of the elements of the crime charged; it must provide adequate notice of the nature of the charges so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense.

*United States v. Fassnacht*, 332 F.3d 440, 444–45 (7th Cir. 2003). The indictment met these requirements. Finally, the district court gave the jury clear instructions on the age-of-victim issue as it pertained to the facts of this case.

photographic evidence of his sexual abuse of Thai boys. The district court allowed this evidence as proof of Stokes's intent in traveling to Thailand, as is permitted under Rule 404(b) of the Federal Rules of Evidence. The district court also admitted the evidence under Rules 413 and 414, which expressly permit the introduction of the defendant's prior acts of sexual assault or child molestation in a prosecution for sexual assault or child molestation.

Stokes first claims that Rules 413 and 414 are unconstitutional under the Due Process Clause and the equal-protection component of the Fifth Amendment. We have already rejected this argument, *see United States v. Julian*, 427 F.3d 471, 487 (7th Cir. 2005), as has the Tenth Circuit, *see United States v. Castillo*, 140 F.3d 874, 883 (10th Cir. 1998). We see no reason to revisit the issue here.

Stokes also insists that the other-acts evidence was admitted in violation of Rule 404(b). This argument is frivolous. Stokes's sexual abuse of young boys both before and after his travel to Thailand was directly and centrally relevant to his intent at the time of his travel, an element of the crime and a permitted purpose for the admission of other-acts evidence under Rule 404(b). *See* FED. R. EVID. 404(b)(2) (other-acts evidence "may be admissible for [a nonpropensity] purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). Indeed, Stokes's intent was the key disputed issue at trial. If that were not enough, as we have noted, Rules 413 and 414 expressly permit the introduction of prior acts of sexual assault or sexual molestation in a prosecution for sexual assault or

sexual molestation, overriding the propensity bar in Rule 404(a)(1).

Moreover, in a case quite similar to this one involving a § 2423(b) prosecution, we have upheld the admission of the defendant's past acts of child molestation under Rules 404(b), 413, and 414. *See United States v. McGuire*, 627 F.3d 622, 626–27 (7th Cir. 2010) (holding that "[t]he testimony [of the child victims] was admissible as evidence of the defendant's *modus operandi* (and thus not excludable under Rule 404(b) of the Federal Rules of Evidence), and it was also admissible under Rules 413 and 414 as evidence of the defendant's previous crimes" (citation omitted)). We have also upheld the admission of the defendant's past acts of child molestation to show motive in child-pornography cases. *See, e.g.*, *United States v. Russell*, 662 F.3d 831, 846–47 (7th Cir. 2011) (holding that prior molestation was allowed under Rule 404(b) to show defendant's motive in taking obscene photographs of children); *United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006) (holding that prior acts of sexual misconduct with a child are admissible to establish defendant's sexual interest in children and motive under Rule 404(b)).

Finally, this evidence was not unfairly prejudicial to Stokes under Rule 403. The government limited its photographic evidence to 20 representative images and presented the testimony of only two of Stokes's many victims.

### ii. *Evidence of Stokes's changed lifestyle*

Stokes sought to introduce evidence that he dramatically changed his lifestyle following the search of his home in 2003.

Recall that three years passed between the October 2003 search and Stokes's arrest in 2006. Stokes wanted to testify that during this time, he got married, moved to a different area of Thailand, held a respectable position in a university, and established strong relations with his wife's family. The district court excluded this evidence as irrelevant. This ruling was sound. Any change in Stokes's ways after October 2003 was utterly irrelevant to his purpose in traveling to Thailand in March 2000 and January 2002.

### 4. *Sufficiency of the Evidence*

Stokes next claims that the government's evidence was insufficient to convict him. This argument is frivolous. A defendant challenging the sufficiency of the evidence faces an intimidating standard of review. We ask only "whether after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Stokes plows ahead undeterred, arguing that the evidence was insufficient because it "only established a general propensity to engage in illicit sexual activity" and did not "in any way speak to his specific intent on the relevant date" of his travel.

The illicit purpose of Stokes's travel was unmistakably established by the abundant evidence of what he did before and after the travel. Immediately after being convicted of misdemeanor battery for molesting two young boys in Florida, he sought and received permission to move to Thailand. Less than a month later he made the move, and within two weeks

of arriving in Thailand, began enticing young Thai boys for sex. This activity continued unabated for three years, with a brief hiatus for a three-week trip to the United States in December 2001. His return trip to Thailand in January 2002 was marked by an immediate resumption of his sexual activity with young Thai boys. The evidence was overwhelming and easily sufficient to convict Stokes under § 2423(b).

### 5. *Ineffective Assistance of Counsel*

Stokes also argues that his counsel had insufficient time to prepare for trial and was constitutionally ineffective. Challenges to trial counsel's performance are best brought on collateral review rather than direct appeal. *See Massaro v. United States*, 538 U.S. 500, 504–05 (2003) ("When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."). Stokes raised the issue of counsel's ineffectiveness in an underdeveloped argument on motions after verdict. The district court denied relief, and Stokes asks us to address the issue now. We can't think of a good reason for that strategy. "Circuit law is clear … that a 'defendant who complains on direct appeal about the quality of his lawyer can't try again on collateral attack unless there has been an intervening change of law.' " *Peoples v. United States*, 403 F.3d 844, 846 (7th Cir. 2005) (quoting *Ryan v. United States*, 214 F.3d 877, 879 (7th Cir. 2000)). We think it best to leave the issue for collateral review.

**6.** *Sentencing Arguments*

In the first of several sentencing arguments, Stokes claims that the district court erred by increasing his offense level under U.S.S.G. § 2G2.1(b)(1)(A) because some of his victims were under 12 years old. This argument, based on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), is frivolous and has been for some time. The argument "ignores the effect that [*United States v. Booker*, 543 U.S. 220 (2005)] had on federal sentencing." *United States v. White*, 472 F.3d 458, 464 (7th Cir. 2006). Because *Booker* rendered the sentencing guidelines advisory, "sentencing enhancements need not be found by a jury beyond a reasonable doubt because they no longer alter the statutory maximum." *Id*. Stokes also relies on *United States v. O'Brien*, 130 S. Ct. 2169 (2010), but we cannot tell why. *O'Brien* involved a *statutory* penalty provision.

Stokes also objects to the imposition of a guidelines adjustment for obstruction of justice under U.S.S.G. § 3C1.1. He has misunderstood the district court's guidelines calculation. The court did not in fact apply the obstruction adjustment because with or without it, Stokes's advisory guidelines range was life, exceeding the statutory maximum of 15 years.

Finally, Stokes's sentence is unaffected by the Supreme Court's recent decision in *Peugh v. United States*, 133 S. Ct. 2072 (2013). To calculate Stokes's advisory sentencing range, the district court used the 2010 guidelines manual in effect at the time of sentencing. This approach was consistent with then-existing circuit precedent. *See United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006)*. In *Peugh*, however, the Supreme Court abrogated *Demaree*.

*Peugh* addressed "whether there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." 133 S. Ct. at 2078. The Court held that "[a] retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Id.* at 2084. But the Court also noted that an ex post facto error may be harmless in "cases in which the record makes clear that the District Court would have imposed the same sentence under the older, more lenient Guidelines tha[n] it imposed under the newer, more punitive ones." *Id.* at 2088 n.8.

The parties submitted supplemental briefs on the effect of *Peugh* on Stokes's sentence. They agree that the adjusted offense level would have been lower under the guidelines in effect in 2002, the time of Stokes's last travel to Thailand. But even with the reduced offense level, the advisory guidelines range would have been 210 to 262 months, still well above the statutory maximum of 15 years.

Moreover, the district judge made it abundantly clear that she would impose the 15-year maximum no matter what the guidelines advised her to do:

> I am of the view that nothing short of the maximum penalty is appropriate here. I am imposing a sentencing of 180 months, which is what the statute calls for.
>
> … .

> I am satisfied that Mr. Stokes needs to be separated from society for as long as I have it in my power to do that. 180 months.

The judge could not have been clearer. Accordingly, *Peugh* does not affect this case for two reasons. Stokes's sentencing range exceeded the statutory maximum no matter which guidelines manual applied, so Stokes never actually faced a "retrospective increase in the Guidelines range applicable to [him]." *Id.* at 2084. And because the judge would have imposed the statutory maximum regardless, any arguable ex post facto error was harmless.

AFFIRMED.